**United States District Court**
**District of Massachusetts**

```
_____
                               )
Dhananjay Patel, et al.,       )
                               )
        Plaintiffs,            )
                               )
        v.                     )
                               )    Civil Action No.
7-Eleven, Inc., et al.,        )    17-11414-NMG
                               )
        Defendants.            )
_____)
```

**MEMORANDUM & ORDER**

**GORTON, J.**

This is a putative class action brought by Dhananjay Patel, Safdar Hussain, Vatsal Chokshi, Dhaval Patel and Niral Patel (collectively "plaintiffs") on behalf of themselves and a putative class of similarly situated individuals who operate franchise stores of 7-Eleven, Inc. ("7-Eleven" or "defendant") in the Commonwealth of Massachusetts.

Plaintiffs allege that 7-Eleven (1) misclassifies its franchisees as independent contractors instead of employees in violation of the Massachusetts Independent Contractor Law, Mass. Gen. L. c. 149, § 148B (Count I), (2) has violated the Massachusetts Wage Act, Mass. Gen. L. c. 149, § 148 (Count II) and (3) has violated the Massachusetts Minimum Wage Law, Mass. Gen. L. c. 151, §§ 1, 7 (Count III). Plaintiffs initially made

-1-

similar claims against two 7-Eleven market managers, Mary Cadigan and Andrew Brothers ("the individual defendants") but this Court dismissed those claims on July 20, 2018.

7-Eleven has counterclaimed, (1) seeking declaratory judgment that the various franchise agreements are void (Counterclaim I); (2) for breach of contract (Counterclaim II); and (3) for contractual indemnity (Counterclaim III).  7-Eleven also filed a third-party complaint on the same grounds against DPNEWTO1, Inc., DP Tremont Street, Inc., DP Milk Street, Inc. and DP Jersey, Inc. (collectively, "third-party corporate defendants"), each of which is a corporation through which a named plaintiff contracted with 7-Eleven.

Pending before the Court are the parties' cross motions for summary judgment and plaintiffs' motion for class certification.

I.   **Background**

   A.   **The Parties**

7-Eleven is a Texas corporation with its principal place of business in Texas.  For more than 50 years, 7-Eleven has sold convenience store franchises.  In addition to its franchises, 7-Eleven operates corporate stores, which are managed and staffed by acknowledged 7-Eleven employees ("company operated 7-Elevens").  As of 2018, there were approximately 1,700 company operated 7-Elevens and 7,200 franchisee-operated 7-Elevens in

the United States.  Approximately 160 of those franchisee-operated 7-Elevens are in Massachusetts.

The named plaintiffs are residents of Massachusetts who acquired 7-Eleven franchises and work as store managers and clerks in Massachusetts.  Dharmesh and Dhaval Patel entered into a franchise agreement for a 7-Eleven store located on Tremont Street in Boston, Massachusetts in December, 2010.  DP Tremont St, Inc., of which Dhaval Patel is the president, is listed as the franchisee of the Tremont Street 7-Eleven.

Dharmesh and Niral Patel entered into a franchise agreement in December, 2010, for a 7-Eleven store located on Milk Street in Boston.  DP Milk Street, Inc., of which Niral Patel is the president, is the franchisee for the Milk Street 7-Eleven.

In December, 2012, DPNEWTO1, Inc. entered into a franchise agreement with 7-Eleven, signed by Vatsal Chokshi.  Chokshi entered into another franchise agreement with 7-Eleven on behalf of DP Jersey, Inc. in March, 2011.

In May, 2007, Dhananjay Patel entered into a franchise agreement with 7-Eleven and in December, 2016, Sadar Hussain renewed a prior franchise agreement with 7-Eleven.

### B.   The Franchise Agreements

Each plaintiff, either on behalf of himself/herself or through a third-party corporate defendant, signed a franchise

agreement with 7-Eleven that contains substantially similar terms ("the Franchise Agreement").

The Statement of Intent in each agreement explains that "[f]ranchising is a method of distributing goods or services in a consistent manner" and that the franchisee acknowledges the importance of a uniform and high-quality presentation of the 7-Eleven brand.  It further provides that 7-Eleven agrees to

> assist [the franchisee] by providing a recognized brand, merchandising advice and operational systems . . . . [and to] contribute the value of the 7-Eleven [trademark] and brand. . .

Section 2 of the Franchise Agreement provides that the franchisee agrees "to hold [himself/herself] out to the public as an independent contractor" as well as to exercise "complete control" over the day-to-day operations of the store and all store employees.

In Section 4 of the Franchise Agreement, the franchisee agrees to participate in various initial and ongoing training programs and to train his or her store employees.  Plaintiffs each testified that they do, in fact, train their store employees.

Pursuant to Section 5, the franchisee agrees that he/she is the sole owner of the store and will keep 7-Eleven's proprietary information confidential.  Section 5 also contains a noncompetition clause that restricts franchisees from operating

competitive businesses within a 1/2 mile of a 7-Eleven during the term of the Franchise Agreement.  Several plaintiffs testified that they have operated competitive businesses in compliance with the noncompetition clause during the term of the Franchise Agreement.

Section 7 outlines the license granted by 7-Eleven to the franchisee ("the 7-Eleven License").  Specifically, 7-Eleven grants "the right and license" and the franchisee agrees to accept the "right and obligation" to operate a 7-Eleven store using 7-Eleven's intellectual property, trade secrets and proprietary products.

Section 10(a) explains the "7-Eleven Charge", a fee 7-Eleven collects in exchange for providing the 7-Eleven License.

> 7-Eleven Charge. You agree to pay us the 7-Eleven Charge for the License, the Lease and our continuing services. The 7-Eleven Charge is due and payable each Collection Period with respect to the Receipts from the Collection Period at the time the deposit of those Receipts is due. . . . You may not withhold Receipts or prevent payment of the 7-Eleven Charge to us on the grounds of the alleged non-performance or breach of any of our obligations to provide services to you or any other obligations to you under this Agreement or any related agreement.

Section 15 governs merchandising and inventory in 7-Eleven stores.  7-Eleven requires that franchisees purchase a certain percentage of recommended inventory from recommended vendors. That inventory is subject to product packaging and display

requirements.  7-Eleven provides floor layouts ("planograms") that recommend, but do not require, that inventory be placed in certain areas throughout the store.  Recommended inventory may, however, be removed or altered with 7-Eleven's consent, which may not be unreasonably withheld.

Section 19 of the Franchise Agreement identifies various additional covenants, including the franchisee's obligation to (1) maintain ethical standards; (2) work full time in the store and supervise day-to-day operations; (3) operate the store 24-hours a day unless prohibited by law or otherwise agreed to in writing; (4) properly record all sales; (5) wear and cause employees to wear apparel approved by 7-Eleven while working; and (6) use the 7-Eleven payroll system.

Franchisees must pay all sales, inventory, payroll, occupancy, business and income taxes related to their store pursuant to Section 21.  Employees' wages are to be paid from the franchisees' share of the revenue.  Franchisees may determine how many employees to hire, how much to pay them and whether to pay them a salary or an hourly wage.

7-Eleven collects an "advertising fee" from franchisees and arranges for advertisements in local, regional or national ad campaigns pursuant to Section 22(a).  Franchisees may also, with

the written consent of 7-Eleven, engage in local advertising if such advertising "accurately portrays" 7-Eleven.

According to the Security System and Monitoring Amendment to the Franchise Agreement, as described in the parties' statements of fact, 7-Eleven installs 24/7 video surveillance in 7-Eleven stores for training purposes, investigation of potential criminal conduct, fraud and personal injury.

7-Eleven does not pay franchisees a salary.  Instead, franchisees may withdraw weekly or monthly "draws" from the store's gross profit minus the 7-Eleven Charge and store expenses.  Franchisees are, however, required to ensure that their stores maintain a minimum net worth.

C.    **Procedural Background**

Plaintiffs filed their statutory claims with the Office of the Attorney General and received a right to sue letter, as required by Mass. Gen. L. c. 149, § 50.  Thereafter they filed this action in Massachusetts Superior Court for Middlesex County and defendant promptly removed the case to this Court on diversity grounds.

7-Eleven and the two other named defendants moved to dismiss.  Plaintiffs opposed that motion and moved to remand the case and to enjoin defendants from obtaining releases from putative class members.  In July, 2018, this Court denied

plaintiffs' motion to remand, plaintiffs' emergency motion for injunctive relief and 7-Eleven's motion to dismiss.  The Court allowed the motion to dismiss of the two individual defendants.

Plaintiffs then moved to dismiss 7-Eleven's counterclaims and third-party complaint which the Court denied.

In March, 2020, both parties timely filed cross motions for summary judgment and plaintiffs filed their motion for class certification.  The deadline for all remaining discovery is November 30, 2020, and trial is scheduled to commence in January, 2021.

## II.   **7-Eleven's Motion for Summary Judgment**

### A.   **Legal Standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby,

Inc._,_ 477 U.S. 242, 248 (1986).  A genuine issue of material
fact exists where the evidence with respect to the material fact
in dispute "is such that a reasonable jury could return a
verdict for the nonmoving party." Id.

If the moving party satisfies its burden, the burden shifts
to the non-moving party to set forth specific facts showing that
there is a genuine, triable issue. Celotex Corp. v. Catrett_,_ 477
U.S. 317, 324 (1986).  The Court must view the entire record in
the light most favorable to the non-moving party and make all
reasonable inferences in that party's favor. O'Connor v.
Steeves_,_ 994 F.2d 905, 907 (1st Cir. 1993).  Summary judgment is
appropriate if, after viewing the record in the non-moving
party's favor, the Court determines that no genuine issue of
material fact exists and that the moving party is entitled to
judgment as a matter of law. Celotex Corp., 477 U.S. at 322-23.

### B.  The Massachusetts Independent Contractor Law ("the Massachusetts ICL")

In Massachusetts, "an individual performing any service"
for another is presumed to be an employee. Mass. Gen. L. c. 149,
§ 148B(a).  The purported employer may rebut that presumption by
establishing the three conjunctive elements of an independent
contractor relationship:

(1) the individual is free from control and direction
    in connection with the performance of the service,

> both under his contract for the performance of
> service and in fact; and

> (2) the service is performed outside the usual course
> of the business of the employer; and,

> (3) the individual is customarily engaged in an
> independently established trade, occupation,
> profession or business of the same nature as that
> involved in the service performed.

Id. at § 148B(a)(1)-(3) ("the ABC Test").  Failure to satisfy

any prong of the ABC Test results in classification of the

individual as an employee. Sebago v. Bos. Cab Dispatch, Inc., 28

N.E.3d 1139, 1146 (Mass. 2015).  When the underlying facts are

undisputed, whether the defendant has carried its burden to

satisfy all three prongs is a question of law. See Athol Daily

News v. Bd. of Review of the Div. of Emp't Training, 786 N.E.2d

365, 370 (Mass. 2003).

In interpreting the Massachusetts ICL, this Court finds

instructive an advisory document from the Attorney General's

Fair Labor Division on M.G.L. c. 149, §148B, 2008/1,

https://www.mass.gov/doc/attorney-generals-advisory-on-the-

independent-contractor-law/download ("AG Advisory").  The

Massachusetts Supreme Judicial Court has recognized that the

Attorney General's office is

> charged with enforcing the wage and hour laws [and]
> its interpretation of the protections provided
> thereunder is entitled to substantial deference.

Sebago, 28 N.E.3d at 1149.

C.    **Arguments of the Parties**

7-Eleven contends that the Massachusetts ICL is inapplicable because (1) 7-Eleven provides services to its franchisees, not the other way around, and (2) compliance with another state law makes it impossible for 7-Eleven to satisfy the first element of the Massachusetts ICL.

Plaintiffs respond that (1) the Massachusetts ICL applies because plaintiffs provide services that are integral to 7-Eleven's business model, (2) the Massachusetts ICL is not preempted by federal regulations and (3) plaintiffs are entitled to a presumption that they are employees which 7-Eleven has failed to rebut.

D.    **Application**

1.  **Plaintiffs' Objections to 7-Eleven's Expert**

As a preliminary matter, plaintiffs object to 7-Eleven's reliance upon the affidavit of 7-Eleven's proffered expert witness Francine Lafontaine ("Lafontaine").  Specifically, they complain that Lafontaine's testimony was not disclosed in violation of Fed. R. Civ. P. 26.  7-Eleven responds that Fed. R. Civ. P. 26 requires only that experts be disclosed 90 days before trial, which is currently scheduled to commence in January, 2021.  Defendant further contends that it disclosed to plaintiffs its intent to rely on expert testimony and suggested

setting dates for expert discovery but plaintiffs rejected expert testimony and discovery as unnecessary.

The Joint Submission of the parties filed on October 16, 2019, supports defendant's position.  With respect to expert discovery, the Joint Submission provides:

> Defendant intends to use expert affidavits to support their positions on summary judgment (or oppose plaintiffs' position) and to oppose class certification.  Plaintiffs do not believe an expert is appropriate in this case, except perhaps on damages, and intend to object to 7-Eleven's use of an expert at the merits stage of the case.  Defendant proposed a case schedule that included time for the parties to conduct expert discovery.  Plaintiffs rejected that schedule as unnecessary.  Accordingly, Defendant intends to object to any future request by Plaintiff for expert discovery, or to use expert testimony, as waived. Defendant reserves its right to take expert discovery should Plaintiffs be granted leave to submit expert testimony.

Defendant notified plaintiffs approximately six months prior to filing its motion for summary judgment of its intent to rely on expert testimony.  Despite that admonition, plaintiffs insisted that there was no need to set a deadline for expert disclosures.  The current scheduling order provides that "all remaining discovery" shall be completed by November 30, 2020. Neither that date, nor the default deadline of 90 days prior to trial, has expired.

Even if defendant should have disclosed its expert prior to filing its motion for summary judgment, its failure to do so was

substantially justified given plaintiffs' insistence that disclosure deadlines were unnecessary. See Fed. R. Civ. P. 37 ("If a party fails to provide . . . a witness as required by Rule 26(a) or (e), the party is not allowed to use that . . . witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."). Such a failure is also harmless because, as explained below, the Court will enter summary judgment in defendants favor on a legal issue that does not benefit from the proffered expert testimony. Accordingly, plaintiffs' objection to defendant's failure to disclose its expert is overruled.

Plaintiffs separately object to the relevance of defendant's proffered expert testimony. Relying on Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1316 (11th Cir. 2013), they contend that the question before the Court relates to the nature and degree of the control defendant exercises over plaintiffs, not why such control was exercised or whether such control is necessary to the nature of the business. Plaintiffs' relevancy objection is overruled. In this district, the context of the business, particularly where, as here, the business is heavily regulated, is relevant. See Ruggiero v. Am. United Life Ins. Co., 137 F. Supp. 3d 104, 114 (D. Mass. 2015).

### 2. Whether Plaintiffs Provide "Services" to 7-Eleven

The threshold inquiry under the Massachusetts ICL is whether an individual provides "any services" to the purported employer. Mass. Gen. L. c. 149, § 148B(a). "Services" is construed liberally to effectuate the remedial purpose of the statute in "protect[ing] employees from being deprived of the benefits enjoyed by employees through their misclassification." Somers v. Converged Access, Inc., 911 N.E.2d 739, 749 (Mass. 2009). Whether a worker provides services to a purported employer is, ordinarily, a question of fact on which plaintiff bears the burden of proof. Nat'l Ass'n of Gov't Emps. v. Lab. Rel. Commission, 796 N.E.2d 856, 858 (Mass. App. Ct. 2003). When the underlying facts are undisputed, however, the Court may enter summary judgment. Id.

Relying primarily on the report of its expert Lafontaine, 7-Eleven contends that it subscribes to the "business-format franchise" model whereby it, the franchisor, provides services to the franchisee. 7-Eleven emphasizes the language of the Franchise Agreement which requires each franchisee to pay the 7-Eleven Charge in exchange for a license to use 7-Eleven's marks, operating system, property and other "continuing services." Defendant summarizes the testimony of Lafontaine as asserting

that the 7-Eleven franchise model conforms to that of a standard business-format franchise.

Plaintiffs respond that the services inquiry is a low threshold requiring only that an individual perform "any" service.  Plaintiffs point to, among other things, their "obligation" to operate 7-Eleven convenience stores, work full time in those stores, prepare and submit cash reports, deposit receipts, pay taxes and maintain a reasonable and representative quantity of recommended inventory.

Given the nature of 7-Eleven's business-format franchise, the competing allegations, the various contractual obligations of both parties and the language of the Franchise Agreement, genuine issues of material fact remain such that it is inappropriate to enter summary judgment on the threshold services question at this juncture.  The Court therefore proceeds to defendant's alternative argument as to why the Massachusetts ICL does not apply on these facts.

### 3.  Whether the Massachusetts ICL is Inapplicable

Assuming _arguendo_ that plaintiffs provide services to 7-Eleven, 7-Eleven contends that, because federal regulation makes it impossible to satisfy the first prong of the ABC Test ("Prong 1"), the test does not apply.  Prong 1 requires 7-Eleven to demonstrate that the plaintiffs are "free from control and

direction in connection with the performance of the service."
Mass. Gen. L. c. 149, § 148B(a)(1).  The inquiry is primarily
concerned with the actual relationship of the parties, although
contractual provisions governing the relationship are
instructive. AG Advisory, at 3; see also Ruggiero, 137 F. Supp.
3d at 113.  To meet its burden under Prong 1, a purported
employer must demonstrate that the worker is free from
supervision "as to the result to be accomplished" and as to the
"means and methods . . . utilized in the performance of the
work." Athol Daily News, 786 N.E.2d at 371.  Prong 1 is not,
however, so narrow as to require that an individual be "entirely
free from direction and control from outside forces." Id.

    Plaintiffs offer a litany of examples of the control 7-
Eleven exercises over them both in reality and as provided for
in the Franchise Agreement.  For example, they submit that 7-
Eleven corporate market managers communicate with franchisees on
a daily basis and inspect their stores.  Franchisees are subject
to termination if they fail to meet 7-Eleven's "exacting"
standards regarding cleanliness, inventory and hours of
operation.  Plaintiffs also note that 7-Eleven requires
franchisees to wear uniforms while working; utilize 7-Eleven
payroll systems; list 7-Eleven on certain business licenses; and
hold themselves out to the public as independent contractors.

7-Eleven responds with counter-examples of the control franchisees exercise over their own stores.  For instance, pursuant to Section 2 of the Franchise Agreement, plaintiffs exercise "complete control" over the operation of the store and all store employees.  Plaintiffs are responsible for hiring, training and managing all store employees as well as determining employee salaries and whether to pay salary or hourly wages. Franchisees also pay all sales, inventory, payroll, occupancy, business and income taxes related to their store.

7-Eleven nevertheless concedes that it does exercise some level of control over its franchisees but argues that it is bound to do so by federal regulation.  The Federal Trade Commission ("FTC") possesses the authority to promulgate regulations prohibiting unfair or deceptive trade practices. 15 U.S.C. § 57a(a).  Pursuant to that authority, the FTC promulgated a series of regulations collectively called the "FTC Franchise Rule," 16 C.F.R. § 436.1 et seq., with the intent

> to prevent deceptive and unfair practices in the sale of franchises and business opportunities and to correct consumers' misimpressions about franchise and business opportunity offerings.

72 Fed. Re. 15,444, 15,445 (March 30, 2007). The FTC Franchise Rule defines a franchise as

> any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the

offer or contract specify, or the franchise seller promises or represents, orally or in writing, that:

(1) The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark;

(2) **The franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation**; and

(3) As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate.

16 C.F.R. § 436.1(h) (emphasis added).

After amending the FTC Franchise Rule in 2008, the FTC published the FTC's Franchise Rule Guide, https://www.ftc.gov/system/files/documents/plain-language/bus70-franchise-rule-compliance-guide.pdf, ("the Guide") to assist franchisors in complying with the amended FTC Franchise Rule. The Guide provides that a business relationship "will not be covered [by the FTC Franchise Rule] unless it meets the three definitional elements [of a franchise]." The Guide, at 1.

The bolded language is in direct conflict with Prong 1 of the Massachusetts ICL. Where the FTC Franchise Rule defines a franchisor as one who exerts a "significant degree of control over the franchisee's method of operation," the Massachusetts

ICL requires an individual to be classified as an employee unless that individual is "free from control and direction in connection with the performance of the service."

The Massachusetts Supreme Judicial Court ("the SJC") addressed a similar tension in Monell v. Boston Pads, LLC, 31 N.E.3d 60 (Mass. 2015). In Monell, the SJC considered whether a Massachusetts real estate statute could be squared with the Massachusetts ICL. Id. at 67. The real estate statute required brokers to maintain a certain level of control and supervision over sales agents. Id. The mandated level of supervision and control over agents made it "impossible" for brokers to satisfy Prong 1 of the Massachusetts ICL. Id. The SJC concluded that, although there was no exception in the Massachusetts ICL for real estate brokers, the inherent conflict rendered the Massachusetts ICL inapplicable. Id. at 69-70. It took no position on whether some other framework might nonetheless apply. Id.

> Monell suggests that
>
> where a relationship as defined by regulation
> expressly precludes the satisfaction of a prong of the
> independent contractor statute, the independent
> contractor statute will not govern.

Ruggiero, 137 F. Supp. 3d at 114. 7-Eleven contends that the FTC Franchise Rule plainly requires a degree of control that runs afoul of the Massachusetts ICL.

Plaintiffs' first retort is that "courts in Massachusetts and around the country have routinely applied [the ABC Test] to franchisors."  As defendant aptly notes, however, each of the cases relied upon by plaintiffs either predate <u>Monell</u> or apply foreign law not subject to <u>Monell</u>.  Plaintiffs second rebuttal is that 7-Eleven's failure to address the second and third prongs of the conjunctive ABC Test is fatal.  Their argument misapplies <u>Monell</u> which stands for the proposition that the Massachusetts ICL is inapplicable if a competing statutory scheme precludes satisfaction of any one prong. <u>Monell</u>, 31 N.E.3d at 69-70; <u>see also</u> <u>Ruggiero</u>, 137 F. Supp. 3d at 115.

Plaintiffs next contend that 7-Eleven's argument rests on a flawed interpretation of Prong 1 as requiring an individual to be entirely free from control to qualify as an independent contractor.  Plaintiffs are correct that the "control" prong is not to be interpreted so narrowly as to forbid any level of control but allows for some direction and control. <u>See</u> <u>Athol Daily News</u>, 786 N.E.2d at 370-71.  The FTC Franchise Rule, however, requires more than just "some" control.  It requires a franchisor to exercise "significant" control or else risk not being in compliance with the FTC Franchise Rule. 16 C.F.R. § 436.1(h); <u>see also</u> The Guide, at 1.  In doing so, the rule

established a regulated classification status unique from that of an employee or independent contractor.

The Guide describes the kinds of business arrangements and relationships governed by the FTC Rule, by defining the level of control or assistance a worker must be provided.  To be deemed "significant" the control or assistance offered by the franchisor must "relate to the franchisee's overall method of operation." The Guide, at 2.  Significant control includes:

- site approval for unestablished businesses;
- site design or appearance requirements;
- hours of operation;
- production techniques;
- accounting practices;
- personnel policies;
- promotional campaigns requiring franchisee participation or financial contribution;
- restrictions on customers; and
- locale or area of operation.

The Guide, at 3.  Significant forms of assistance include,

- formal sales, repair, or business training programs;
- establishing accounting systems;
- furnishing management, marketing, or personnel advice;
- selecting site locations;
- furnishing systemwide networks and website; and
- furnishing a detailed operating manual.

The Guide, at 3.

The FTC Franchise Rule also provides that to qualify as a franchise, a franchisee must

> obtain the right to operate a business that is
> identified or associated with the franchisor's
> trademark, or to offer, sell, or distribute goods,
> services, or commodities that are identified or
> associated with the franchisor's trademark.

16 C.F.R. § 436.1(h)(1).  Federal trademark law, in turn,

mandates that a trademark licensee must maintain control over

the use of its trademark or risk constructive abandonment. <u>See</u>

15 U.S.C. § 1127.

Revealing the inherent conflict between the FTC Franchise

Rule and the Massachusetts ICL, the list of control and

assistance identifiers in the Guide is nearly identical to the

litany of control measures that plaintiffs proffer in support of

their mis-classification argument.  Although the FTC Franchise

Rule does not compel an individual to exercise the control

measures listed in the Guide or grant a license to utilize its

trademark, it defines the relationship resulting from those

measures as a franchise.

It cannot be the case, as plaintiffs suggest, that, in

qualifying as a franchisee pursuant to the FTC's definition, an

individual necessarily becomes an employee.  In effect, such a

ruling by this Court would eviscerate the franchise business

model, rendering those who are regulated by the FTC Franchise

Rule criminally liable for failing to classify their franchisees

as employees. <u>See</u> <u>Monell</u>, 31 N.E.3d at 69 (citing Mass. Gen. L.

c. 149, § 148B(d) (mis-classification of employees subject
employer to criminal penalties)).  Not only is such a conclusion
unsupported by Massachusetts law but it also implicates a
legislative decision beyond the purview of this Court.

Where there is a conflict between the Massachusetts ICL and
a regulatory scheme, the specific trumps the general.  <u>Monell</u>, 31
N.E.3d at 69 ("The judge's reliance on the familiar canon of
construction providing that a specific statute . . . controls
over the provisions of a general statute, such as the
independent contract statute, however, is appropriate here.").
The franchise-specific regulatory regime of the FTC governs over
the general independent contractor test in Massachusetts.  <u>See</u>
<u>Monell</u>, 31 N.E.3d at 69.  Accordingly, the Massachusetts ICL
does not apply to 7-Eleven in these circumstances.

The SJC recognized in <u>Monell</u>, that its holding was limited
insofar as it determined that the plaintiffs could not recover
under the Massachusetts ICL but took no position as to whether
they were, in fact, employees pursuant to some other
unidentified common law or statutory test.  <u>Monell</u>, 31 N.E.3d at
69-70.  The SJC acknowledged as much because the real estate
statute, although in conflict with the Massachusetts ICL,
nonetheless contemplates a real estate salesperson as being

"either . . . an employee or . . . an independent contractor" of a broker. Mass. Gen. L. c. 112, § 87RR.

The FTC Franchise Rule does not contain such explicit language.  It does, however, leave open the possibility that a franchisee may be subject to several classifications. 16 C.F.R. § 436.1(h) ("[A]ny continuing commercial relationship or arrangement, **whatever it may be called** . . ." (emphasis supplied)).  The Court need not resolve such ambiguity on these facts, however, because plaintiffs seek employee classification based only on the Massachusetts ICL.  Despite the suggestive language in both Monell and the FTC Franchise Rule, plaintiffs proffer no alternative test for classification status or even suggest an alternative exists.  Consequently, summary judgment in favor of defendant is appropriate on all counts.

Having so concluded, plaintiffs' motions for summary judgment on 7-Eleven's liability for mis-classification and class certification will be denied.  7-Eleven's counterclaims and third-party claims for (1) declaratory judgment that the various franchise agreements are void; (2) breach of contract; and (3) contractual indemnity are not the subject of any summary judgment motion and, therefore, remain pending.

**ORDER**

For the foregoing reasons, the motion of defendant 7-Eleven, Inc. for summary judgment (Docket No. 112) is **ALLOWED**. The motions of plaintiffs for summary judgment and class certification (Docket Nos. 117, 118) are **DENIED**.

The parties are directed to submit a joint status report on defendant's pending counter-claims against plaintiffs and third-party defendants on or before Thursday, September 24, 2020.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated September 10, 2020